THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v THOMAS G. BIANCO, Respondent.

Fourth Department, November 18, 1992

**APPEARANCES OF COUNSEL**

*James B. Vargason, District Attorney* of Cayuga County, Auburn, for appellant.

*Joseph E. Fahey,* Syracuse *(Randi Juda, R. Louis Riley* and *Mary M. Fahey* of counsel), for respondent.

OPINION OF THE COURT

BOOMER, J.

The People appeal from an order granting defendant's motion made pursuant to CPL 440.10 vacating defendant's 1986 judgment of conviction for murder in the second degree. Eighteen-year-old Julie Monson disappeared on the night of September 26, 1981, and her fate was not known until her decomposed body was found in the Montezuma Wildlife Refuge on April 7, 1983. Defendant was arrested in 1985 after the police obtained several statements from defendant's friends detailing defendant's admissions that he was with Julie Monson on the night of her disappearance and that he was responsible for her death. Following trial in 1986, he was convicted and we affirmed defendant's conviction on November 10, 1987 *(People v Bianco,* 134 AD2d 967, *lv denied* 70 NY2d 1004).

After a hearing on defendant's CPL 440.10 motion, the court found that the prosecution committed *Rosario* violations *(see, People v Rosario,* 9 NY2d 286, *rearg denied* 9 NY2d 908, *cert denied* 368 US 866, *rearg denied* 14 NY2d 876, *rearg denied* 15 NY2d 765) with respect to trial witnesses John Bazarnik, William Komanecky and Andrew Komanecky, and that there was a reasonable possibility that those violations contributed to the verdict.

With respect to John Bazarnik, the court found that, although the prosecution had turned over to the defense statements and reports of interviews of the witness on May 11, 1982, August 5, 1982, April 13, 1983, April 19, 1983, and May 5, 1983, it failed to turn over notes of other interviews to defendant's prejudice. At trial, John Bazarnik testified as follows: on May 8, 1982 in the presence of Angela Colvin, defendant stated that he drove Julie Monson in his car and after she got out he ran after her and got her back into the car. He tried to have oral sex with her and she refused and got hysterical and he may have hit her a couple of times. She got out of the car and they started wrestling on the ground. She ran off and he caught up with her. At that point, a car stopped and he asked the driver to take Julie to Cayuga State Park and that he would meet them there. He started to go to Cayuga State Park to meet them, but was short of gas. He had

Julie's coat in his car and he threw it out near a house on North Seward Street. Then defendant and John Bazarnik went into defendant's bedroom where defendant told Bazarnik: "I think I killed her."

Defendant contends that he was prejudiced because of the failure of the prosecution to turn over to defense counsel notes of the interviews with John Bazarnik on May 10, 14, 18, and 21, 1982. The notes of the interview of May 18 show that the interview concerned only where defendant and Bazarnik may have gone fishing together. They do not contain any information concerning the subject of Bazarnik's testimony at trial and, therefore, the notes do not constitute *Rosario* material. The notes of the interview of May 14 state only that the detectives interviewed Bazarnik on that date and they contain no statement made by him. Thus, those notes are not *Rosario* material.

The notes of the interviews of May 10 and 21 constitute *Rosario* material and should have been turned over to defense counsel. The notes of the May 10 interview indicate that, at first, Bazarnik denied that he had any knowledge of the conversation with defendant but later admitted to hearing the same conversation previously related to the police by Angela Colvin.

The notes of the May 21 interview relate that Bazarnik recalled that defendant dated a girl by the name of Meaghan Mahoney. Because Bazarnik testified at trial that defendant had dated Meaghan Mahoney, those notes are *Rosario* material. Nevertheless, those notes had no impeachment value and the failure to turn over the notes did not prejudice defendant.

Defendant contends that he was prejudiced by the failure of the prosecution to turn over the notes of those interviews because they show that, although Bazarnik was interviewed on those occasions, he did not tell the police about defendant's statement that he thought he had killed Julie Monson. We conclude that there was no reasonable possibility that, had the notes of May 10 and May 21 been turned over to defense counsel, the verdict would have been different. At trial, defense counsel cross-examined Bazarnik extensively about two affidavits Bazarnik signed on May 11, 1982 and August 5, 1982 in which he made no mention of defendant's statement about killing Julie Monson. On cross-examination, Bazarnik admitted that he initially told the police that defendant had made no inculpatory statement. Defense counsel also brought out

that the police interviewed Bazarnik on May 10 before he signed the affidavit of May 11. The prosecution turned over to defense counsel notes of a May 5, 1983 interview during which Bazarnik mentioned for the first time that defendant told him he thought he killed Julie Monson. In addition to the two affidavits, defense counsel was in possession of notes of interviews of May 11, 1982, April 13, 1983 and April 19, 1983, and he knew that defendant had been interviewed also on May 10, 1982. It is unreasonable, therefore, to believe that the notes of the May 10 and 21, 1982 interviews had any additional impeachment value that could possibly have changed the verdict.

Concerning Andrew and William Komanecky, the court found that the police had made notes of an interview conducted on October 16, 1981 and had failed to turn them over to defense counsel. At trial, both Andrew and William Komanecky testified that, on the night of the victim's disappearance, they looked out the window of their house and saw two cars across the street. A female got into a male's car and they both drove away. At trial, Andrew Komanecky described the male as "between five [feet] ten [inches] and six feet" tall with "wide shoulders, kind of built like a T-square". William Komanecky described the male as taller than the female but could not say how much taller. He also said that he never actually saw a front view of the male's face because the male did not turn his way. He remembered a side profile: "It seemed like a high cheekbone type of [face]."

Defendant contends that the failure to turn over the notes of the interview of October 16, 1981 was prejudicial because those notes may have contained contradictory statements concerning the description of the male as described by the witnesses. The interview took place in the presence of a psychic, who testified at the CPL 440.10 hearing. She testified that William Komanecky described the male as "big built * * * broad-shouldered" and "probably six [feet tall] maybe better" and that the female looked up at the male. She testified also that neither of the Komaneckys mentioned that the male had high cheekbones. The hearing court found, on the basis of the witness's testimony, that the detectives present took notes of the interview.

Although the notes of the interview may have been useful on cross-examination of the witnesses, they contained no impeachment material in addition to that contained in the *Rosario* material that had been furnished to defense counsel.

Defense counsel was furnished a videotape of the interview with William Komanecky conducted shortly after the victim's disappearance, in which he described the male as a "good-sized guy", wide-shouldered and tall, "a good six inches or so" taller than the female. He also stated that the male never turned toward him. He did not mention that the male had high cheekbones. Also turned over to defense counsel was a police report describing statements of William and Andrew Komanecky on October 2, 1981, in which they indicated that the male was large, with big shoulders, and that he towered over the female. No mention was made in the police report about high cheekbones.

At trial, defense counsel cross-examined Andrew Komanecky concerning a statement he gave to the police on September 28, 1981 that the male appeared to be a weight lifter and had a large chest, shoulders and arms. In response, Andrew stated that he remembered telling the police that the male had wide shoulders and was built more or less like a "T-square". Not only did defense counsel have the benefit of the September 28, 1981 statement, but there was nothing in the testimony of the psychic concerning the October 16, 1981 interview that contradicts any of the trial testimony of Andrew Komanecky.

Defense counsel had the opportunity to cross-examine William Komanecky concerning his contradictory statements about the height of the male. Defense counsel cross-examined the witness extensively about contradictory statements made in the interview and brought to the jury's attention that, in his videotaped interview of September 28, 1981, he said that the male was approximately six inches taller than the female. Thus, the later interview of the Komaneckys not revealed to defense counsel provided no additional impeachment material not in the possession of defense counsel at the time of trial and, in our view, it was not reasonably possible that, if defense counsel had notes of the October 16, 1981 interview, the verdict would have been different.

As noted above, in light of the statements of the witnesses turned over to defense counsel, the *Rosario* materials not disclosed to defense counsel, consisting of notes of two interviews with John Bazarnik and of one interview with William and Andrew Komanecky, were of no significant impeachment value. Because they were of no significant impeachment value and because of the other compelling evidence in the case, we conclude that defendant has failed to "demonstrate a reason-

able possibility that the failure to disclose the *Rosario* material contributed to the verdict" *(People v Jackson,* 78 NY2d 638, 649).

Accordingly, the order should be reversed, defendant's motion denied and the judgment of conviction reinstated.

CALLAHAN, J. P., PINE, BOEHM and DOERR, JJ., concur.

Order unanimously reversed, on the law, motion denied and judgment of conviction reinstated.