OPINION OF THE COURT
Bruce Allen, J.
The postconviction issue now presented in this extraordinary case, which has been in various forms of litigation for more than 20 years, is a deceptively simple one: has the defendant demonstrated that there is a reasonable possibility his guilty verdict would have been different if certain Rosario material had been available at trial? For the reasons set forth below, the answer to this question is "yes”, and the defendant is therefore entitled to a new trial.

Procedural History

In 1973, the defendant was convicted of two counts of attempted murder and one court of felonious possession of a weapon. An earlier trial on the same charges had ended in a mistrial due to a hung jury. Justice Joseph A. Martinis presided at both trials.
The defendant’s direct appeal was turned down by the Appellate Division and the Court of Appeals (People v Moore, 51 AD2d 891 [1st Dept 1976], affd 42 NY2d 421 [1977]). The Supreme Court of the United States then denied certiorari. (434 US 987 [1977].) The defendant did not challenge the legal sufficiency of the evidence on direct appeal.
In 1988, the defendant filed a motion in this court for an order to vacate his conviction pursuant to CPL 440.10. Among the grounds cited was the failure of the People to turn over certain Rosario materials at trial. The defendant had discovered these materials during discovery proceedings in a Federal lawsuit instituted by him against the Federal Bureau of Investigation and others.
In an order dated March 17, 1989, Justice Peter McQuillan denied the defendant’s Rosario claim, citing People v Howard (127 AD2d 109 [1st Dept 1987]). In Howard the panel held that to prevail on a newly discovered evidence claim under CPL 440.10 (1) (g), a defendant must demonstrate that the introduction of the new evidence probably would have changed the *407 verdict. Justice McQuillan concluded that the defendant had failed to meet this test. Following reargument, the denial of the motion was reaffirmed on April 13, 1989.
Defendant appealed to the Appellate Division. In People v Bin Wahad (158 AD2d 312 [1st Dept 1990]), the Court reversed the denial to the extent that it was based on People v Howard (supra). The decision noted that two cases from the Court of Appeals, People v Novoa (70 NY2d 490 [1987]) and People v Jones (70 NY2d 547 [1978]), were in fact the controlling authorities. According to the Court, these cases stood for the proposition that the per se error rule regarding the failure to turn over Rosario material applied to postconviction claims as well as on direct appeal. The order then remitted the matter to this court to determine whether the documents were in fact Rosario material, or whether they were merely duplicative equivalents of materials available to the defendant at trial. The Court of Appeals denied leave to appeal from the Appellate Division order. (75 NY2d 970 [1990].)
Upon remission, the People denied that the defendant had been prejudiced but conceded that some of the materials were not duplicative equivalents and thus constituted Rosario material which had not been turned over at trial. As a result, on March 15, 1990 Justice McQuillan issued an order granting the defendant’s motion to vacate his conviction. On appeal, the Appellate Division affirmed. (172 AD2d 403 [1st Dept 1991].)
After granting leave to appeal, the Court of Appeals reversed. (79 NY2d 787 [1991].) This case was a companion case to People v Jackson (78 NY2d 638 [1991]) decided the same day. In Jackson, the Court of Appeals held that the per se error rule is not applicable when the Rosario claim is raised on a postconviction motion following the completion of the direct appeal. Rather, such a motion is to be treated as arising under CPL 440.10 (1) (f), and in order to prevail the defendant must demonstrate "a reasonable possibility that the failure to disclose the Rosario material contributed to the verdict.” (78 NY2d, at 649.) The Court of Appeals accordingly remitted the case to this court for a hearing and determination of the motion according to the standard announced in Jackson.
The ordered hearing, which concerned only the undisputed Rosario materials, was held before me on October 29, 1992. The trial record as well as numerous other documents were submitted by the parties. No witnesses were called.

*408
The Trial

The defendant’s conviction was for the machine gunning of two New York City Police Officers. Although the evidence of guilt was largely circumstantial, it was certainly compelling if the testimony of the central prosecution witness, Pauline Joseph, is credited. The People’s theory was that the defendant was either the shooter or one of the individuals in the car with the shooter when the machine gunning took place. The evidence at trial may be summarized in the following manner.
On May 19, 1971 the two Officers, Binetti and Curry, were in their patrol car on Riverside Drive in Upper Manhattan, guarding the residence of District Attorney Frank Hogan. At approximately 9:00 p.m., a blue Maverick approached the patrol car slowly, and lured the Officers into a short, high-speed chase down Riverside Drive. As the patrol car pulled up alongside the stopped Maverick, the person in the front passenger seat suddenly opened fire on the Officers with a machine gun. Both Officers were critically wounded but they managed to survive.
The Maverick sped away but witnesses at the scene gave the police several similar license plate number combinations for the car. Two eyewitnesses testified that they had seen two people in the car and two others testified that they had seen three. No witness was able to identify the defendant as one of the individuals in the car. Only one description of any detail of an occupant was placed into evidence: Officer Binetti’s description of the driver. During his summation, the prosecutor conceded that the description did not match the defendant, arguing instead that the person described was Frank Fields, an associate of the defendant.
On the night of May 21, a young woman delivered a package to radio station WLIB. Later that same night, a man delivered a package to the New York Times. Each of these packages contained a license plate matching one of the number combinations witnesses at the scene had given, a bullet similar to those used in the shooting, and a letter claiming credit for the shooting on behalf of the Black Liberation Army. Expert testimony established that both letters had been typed on the same Smith-Corona typewriter. The package to the Times had been placed within a copy of the New York Post. One fingerprint found on the Post was determined to be that of the defendant. Another fingerprint matched Eddie *409 Joseph, a man also linked to the defendant. On May 25, the police found a blue Maverick in the Bronx and impounded it.
On June 5, 1971, the defendant, and three other men— Eddie Joseph, Butch Mason, and Augustus Qualls — were arrested while robbing an after-hours social club in the Bronx. During the robbery the defendant was in possession of a machine gun. The police recovered the weapon and subsequent ballistics tests showed that it was used in the shooting of Binetti and Curry.
Qualls testified that he had met up with the defendant, who was an old friend, and Eddie Joseph on June 1 or June 2. The defendant was in a car and a machine gun was in a duffle bag on the floor of the car. After Qualls had learned from the police that the recovered machine gun was the one used in the shooting, he and the defendant had a conversation in which the defendant clearly implied that he had knowledge of that fact at the time of his first meeting with Qualls.
On May 21, two other Police Officers, Piagentini and Jones, were ambushed and shot to death in Upper Manhattan. The police initially thought that this shooting was related to the attack upon Curry and Binetti, and the investigations were coordinated. At the same time, a separate hot line was set up to obtain information on the Piagentini-Jones murders. On June 12, an anonymous call to this hot line led the police to a woman named Pauline Joseph, who lived at 757 Beck Street in the Bronx.
Pauline Joseph testified that in January 1971, a friend of hers, Jewell Henley, had moved into her house with Andrew Jackson, a member of the Black Panther Party. Over the next several months, a number of other Party members also took up residence there. These individuals included Eddie Joseph, who arrived in February and became Ms. Joseph’s common-law husband, Butch and Ila Mason, Mark Holder, and Michael Dennis Hill, also known as "Mark D”. The defendant frequently visited Eddie Joseph at 757 Beck Street during this period. He and Eddie Joseph were fugitives, having failed to appear in court in the ongoing "Panther 21” trial. Along with the other defendants, however, they were acquitted in early May. In mid-May Michael Dennis Hill moved out, though he continued to visit frequently. On May 15, the defendant moved in, and continued to live at 757 Beck Street until his arrest on June 5. Throughout the months the defendant visited and lived there, he always carried a machine gun *410 which he called "the grease”. Whenever he left or entered the house, he would carry the gun in a duffle bag. Once inside, he always kept the gun nearby.
Pauline Joseph further testified that on May 15, in Hill’s presence, the defendant told her, "We’re going to deal with some pigs.” When she pressed the defendant for details later that day, he said, "Damn it, sister, we’re going to kill them.”
On the afternoon of May 19, the date of the shooting, she and Holder loaded four ammunition clips with cartridges. When the defendant arrived with the gun, he placed two clips in the gun and the other two in a small bag. He put the small bag and the gun in his duffle bag and left the house by himself shortly before 6:00 p.m. Ten minutes later Eddie Joseph left. Five minutes later Butch Mason left.
At 10:30 p.m., the defendant returned to Ms. Joseph’s house, carrying the duffle bag. He took out the gun and the clips and gave a sigh of relief. Ms. Joseph noticed that one of the clips was empty, and asked the defendant what happened to the bullets. Five minutes after the defendant’s arrival, Eddie Joseph returned, followed, within a few minutes of each other, by Holder, Mason, and Frank Fields. Ms. Joseph started to pick up the gun, but Holder said not to touch it because it was "hot”. She replied, "I can see it smoking.”
The men asked Ms. Joseph to tell them when the 11:00 p.m. news came on. After they had watched the news story of the shooting, Ms. Joseph said to the defendant, "I believe you did it.” The defendant responded, "So what, you better learn to keep your mouth shut.”
Later that same evening, Ila Mason and Ms. Joseph went out to a blue Maverick parked near the house. They searched the car and found one bullet casing under the seat. Ms. Joseph had seen Frank Fields driving that car occasionally. She identified it as the one the police had impounded.
On May 20, Ms. Joseph saw the license plates in her apartment. That night she also heard the defendant and Butch Mason discussing whether it was feasible to get into the hospital and "finish off’ the wounded Officers.
The next day, Ms. Joseph saw the defendant and his girlfriend, Patricia Greene, working on the writing and typing of the letters to WLIB and the Times. She saw Ila Mason leaving in disguise that night with the package for WLIB. After the letter was read on the air, the defendant and Eddie Joseph congratulated each other. Following the arrest of the defen *411 dont, Butch Mason, and Eddie Joseph on June 5, Patricia Greene and Joanne Chesimard came to 757 Beck Street and removed guns and other items. On June 12, Ms. Joseph made the anonymous telephone call to the police, pretending to be a friend of Pauline Joseph’s. The police arrived late that night, searched the house, and took her into custody. She remained in custody as a material witness from that time through her testimony at both trials, living under police guard in hotels and an apartment.
On June 13 she wrote and signed a statement saying that on May 19 the defendant, Eddie Joseph, and Butch Mason had left the house at 8:00 p.m., returned at 11:00 p.m., then watched the news. This was the only Rosario statement the People produced prior to her testimony.
Pauline Joseph admitted at trial that she had lied under oath regarding her own prostitution conviction at an unrelated trial involving the defendant. She also admitted having lied on applications for welfare. Defense counsel cross-examined her extensively, and brought out certain inconsistencies with her earlier testimony before the Grand Jury in July 1971 and the first trial in 1972.
Police witnesses testified regarding physical evidence found at 757 Beck Street. The evidence included fingerprints of Hill, Jackson, Eddie Joseph, and the defendant, letters typed on the same typewriter as the Times and WLIB letters, and a letter in the defendant’s handwriting which was similar in style and content.
Patricia Greene testified for the defendant. She maintained that she had not typed the letters. She also testified that she had seen a machine gun at 757 Beck Street, but added that she had never seen the defendant carrying one.
Curtis Mullins, an alibi witness, also testified for the defendant. He was effectively impeached on cross-examination, however, and probably hurt the defense more than he helped it.
An issue arose at trial regarding the anonymous telephone call made by Pauline Joseph. The People did not provide a transcript of the call prior to her testimony. She testified that in the call she had said that the arrested men (referring to the June 5 arrest of the defendant and others) were not responsible for the Piagentini-Jones murders. She also claimed that she had not said anything about the Binetti-Curry shootings. Two days after she completed her testimony, the prosecutor *412 provided the defense with a transcript. It indicated that Ms. Joseph had in fact stated that the arrested men were not responsible for the Binetti-Curry shootings either. The defense declined to recall her at that time, however, and the transcript was entered into evidence by stipulation. Three days later, the defense counsel changed his mind and asked to recall Ms. Joseph to cross-examine her about this inconsistency. The prosecutor then reported that she had been released from custody in the interim, and that he was unable to locate her.
Near the outset of the trial, an article entitled "Target Blue” appeared in New York Magazine. It was written by Robert Daley, a former Deputy Commissioner of the New York City Police Department. The article gives an account of the Binetti-Curry shootings which is apparently based on some of the memoranda of FBI interviews of Pauline Joseph which are at issue here. The defense counsel offered to put passages from the article into evidence, but the court found them inadmissible. The court also refused to subpoena Mr. Daley to determine his source.
The defense counsel made numerous requests for Rosario materials throughout the trial. On each occasion the prosecutor stated that he had made a thorough search and that everything had been turned over.

The Rosario Material

As mentioned, the prosecutor has now conceded that the documents under consideration are Rosario material.
The first group of documents are FBI reports which contain prior statements of two witnesses. These reports came into the People’s possession, and thus became Rosario materials, when they were sent by the FBI as part of a memorandum dated September 29, 1971 to Albert Seedman, then Chief of Detectives of the New York City Police Department.
After the defendant discovered FBI records indicating that this memorandum had been sent to Chief Seedman, the People determined that he had received it and conceded it was Rosario material. (Accordingly, no findings are necessary regarding a copy subsequently found in the District Attorney’s Piagentini-Jones file.) The specific documents are:
1) A report of a statement given by Augustus Qualls to New York City Police on June 5, 1971.
*413 2) A report quoting Pauline Joseph’s anonymous call to the police on June 12, 1971.
3) Separate reports of statements given by Pauline Joseph to FBI Agent John Jimerson on June 18, and August 10, 11, 13, and 23, 1971.
In addition, the People unearthed the handwritten notes of interviews with 11 witnesses taken by Assistant District Attorney John Keenan during the summer of 1971. At the time Keenan headed the investigation into the Binetti-Curry shootings for the District Attorney’s office.

Discussion

Under the oft-stated Rosario rule, the People must provide at trial to the defense any materials in the People’s possession which contain prior material statements of a prosecution witness. The only exception to this rule is when the material contains duplicative equivalents of a provided statement. Since People v Consolazio (40 NY2d 446 [1976]), the failure to provide Rosario material has been considered per se reversible error on direct appeal. The purpose of this seemingly harsh rule has been explained by the Court of Appeals on numerous occasions. For instance, in People v Jones (supra), the Court stated that a witness’s prior statements are necessary to afford the defendant a fair opportunity to cross-examine, and only defense counsel is in a position to determine which statements would be useful. To apply anything other than a per se standard would require the court to gouge the potential effect of the Rosario material, and, due to its nature and purpose, such an analysis would be virtually impossible. (70 NY2d, at 550-551.)
Nevertheless, in People v Jackson (supra), the Court of Appeals held that the public’s interest in the finality of judgments dictated that the per se rule should not be applied to postconviction motions filed after the direct appeal has been completed. To prevail at this stage the defendant must show prejudice. The defendant’s burden is similar to that set out in People v Vilardi (76 NY2d 67 [1990]), which dealt with a CPL 440.10 (1) (f) motion based on the People’s failure to produce specifically requested Brady material. In an application such as this one, therefore, the defendant must demonstrate "a reasonable possibility that the failure to disclose the Rosario material contributed to the verdict.” (People v Jackson, 78 *414 NY2d, at 649, supra.) In other words, there must be a reasonable possibility that the verdict would have been different.
The only appellate case since Jackson (supra) in which the standard has been applied is People v Bianco (183 AD2d 284 [1992]). In Bianco, an identification witness had testified at trial that he remembered the defendant’s high cheekbones. The defendant brought a CPL 440.10 (1) (f) motion to vacate his murder conviction on the basis of a newly discovered Rosario statement in which the witness had given a description to the police which made no mention of high cheekbones, and said the witness did not see the perpetrator’s face. The trial court, citing Jackson (supra), granted the motion, but the Fourth Department reversed. The panel found that the Rosario statement was of no significant new impeachment value because the defendant had available at trial another similar statement by the same witness. In addition, there was a great deal of other evidence implicating the defendant. Therefore the panel concluded that there was no reasonable possibility that the verdict would have been different if the Rosario material had been provided at trial.
As the Bianco case (supra) shows, there are certain difficulties in applying the Vilardi standard to postconviction Rosario claims. Brady material can be weighed more or less directly for its exculpatory value. The potential effect on the verdict of impeachment evidence, the most common use of Rosario material, is much harder to evaluate. For example, a witness’s credibility may be undermined by a seemingly innocuous statement if it is skillfully used and developed by the cross-examiner. In determining whether the defendant here has met his burden, therefore, the more subtle aspects of Rosario materials must be ignored, and the focus must be on readily apparent inconsistencies between a witness’s prior statements and the trial testimony.
Some of the materials at issue here contain prior statements which are so similar to the testimony given or other prior statements, or involve such collateral issues, that they would not have had any potential effect on the verdict.
The Keenan notes fall into this category. Most are entirely consistent with the respective witnesses’ trial testimony. The defendant has raised an issue only with regard to two of the notes.
According to the notes, Fred Costanza, the prosecution witness who saw the man delivering the package to the Times, *415 described the man as being in his 40’s. At trial he described the man as about 30 years old. This is a highly collateral issue, especially since there was no contention that the defendant delivered the package. In any event, the defense had a similar prior statement available at trial.
The second contention is that the Keenan notes regarding Calvin Shields, who saw the woman deliver the package to WLIB, do not contain any description of the woman. At trial Shields gave a description which matched Ila Mason. Again this is highly collateral, and it is unlikely that the jury would have viewed this omission as an important inconsistency.
The log of Pauline Joseph’s anonymous telephone call to the police on June 12, 1971 is identical in wording to the one introduced at trial. While that log was delivered late, it nevertheless was given at a time when the defense still could have cross-examined Ms. Joseph. Yet counsel initially chose not to recall her. Thus, it was due in part to the defendant’s delay that the opportunity was lost. In any event, since the matter was aired on the record at trial, the issue could have been raised on direct appeal. It cannot be resurrected now simply because another copy of the statement has been found.
Some of the materials are clearly subject to the analytical problems alluded to in Jones (supra). These are prior statements which, as Rosario put it, may reflect on cross-examinatian a witness’s bias or give "[s]hades of meaning, stress, additions or omissions * * * which will place the witness’ answers upon direct examination in an entirely different light.” (People v Rosario, 9 NY2d 286, at 289.) An example here would be some of the statements about Eddie Joseph in the memorandum of Pauline Joseph’s June 18, 1971 statement.
The June 18 statement is the earliest documented statement in which Ms. Joseph implicates the defendant as one of those directly involved in the shooting. In it Ms. Joseph states that Eddie Joseph was away from February to May 1971 and describes their reunion. She also states that Eddie Joseph and the defendant had an argument the night of May 19 because the defendant had not taken Eddie Joseph with him to the shooting. Defense counsel perhaps could have used this statement not only for its inconsistency with Ms. Joseph’s testimony, as analyzed below, but also to suggest bias on her part. However, the potential effect on the jury of that use of the statement is so highly speculative, being dependent on such *416 factors as skill of counsel, that it is doubtful one could ever say with confidence that it creates a reasonable possibility of a different verdict.
The potential impact on the jury of Pauline Joseph’s August 11, 1971 statement to FBI Agent Jimerson may be analyzed in a more straightforward manner. That statement contains a version of the events at 757 Beck Street on May 19, 1971 which differs in some significant ways from the testimony she gave at trial. That testimony was the only evidence introduced regarding those events, which were crucial to establishing the People’s theory of the case. Therefore, any new impeachment evidence which raises a serious issue regarding the credibility of that testimony must be considered to create a possibility of contributing to the verdict.
Again, the People’s theory was that the defendant was in the car when the shooting occurred, and they were bound to prove that theory.
The evidence apart from Pauline Joseph’s testimony was very strong, indeed overwhelming, on the defendant’s involvement in the shooting. He was in possession of the gun at least as early as June 2 with knowledge that it had been used in the crime. The physical evidence established his part in writing the letters that went to the Times and WLIB, and his general support for violent actions against the police. But that evidence did not place him in the car on May 19, 1971.
The People’s evidence connected at least 11 people to the shooting (Pauline Joseph, Eddie Joseph, Michael Dennis Hill, Mark Holder, Frank Fields, Butch Mason, Ila Mason, Andrew Jackson, Patricia Greene, Joanne Chesimard, and the defendant) either through planning, preparation, writing and delivering the letters, possession of the gun, and/or removing evidence. By Pauline Joseph’s testimony, three of these individuals were at 757 Beck Street when the shooting occurred. Of the remaining eight, only Frank Fields and at most two others were in the car at the time. While the independent evidence was stronger with regard to the defendant than any of the others, that evidence related to events subsequent to the night of the shooting.
Thus, the strongest evidence to support the inference that the defendant was in the car was Pauline Joseph’s testimony regarding his actions and statements at 757 Beck Street immediately prior to and after the shooting.
In the memorandum of her August 11 statement to the FBI, *417 Pauline Joseph’s description of the events the night of May 19, 1971 is recorded as follows: "Joseph advised that on May 19, 1971, she helped Michael d. hill, Richard moore, and frank fields 'clean out’ a dark blue Maverick automobile. Joseph stated that a machine-gun and spent bullet casings were removed from the car. That evening, moore remarked to hill, 'You handled the grease real good; but not good enough, you didn’t kill them.’ Joseph stated that the machine-gun was referred to as the 'grease.’ Later in the evening hill, moore, fields and edward 'jamal’ Joseph discussed the possibility of going to the hospital to 'finish killing’ the two policemen, but decided against it because they felt the hospital would be 'guarded like Fort Knox.’ ”
The People argue that the failure to produce this statement could not have been prejudicial, since it is at least as inculpatory to the defendant as was Pauline Joseph’s trial testimony. This argument may not strictly be true,* but it also misses the import of the statement. The statement would not be offered for the truth of its contents, but rather to impeach Pauline Joseph’s credibility through its inconsistency with her testimony. (See, Richardson, Evidence § 501 [Prince 10th ed].) The fact that the same inference could be drawn from either version does not make them consistent. The inference was the jury’s to make; Pauline Joseph’s testimony went only to describing the circumstances. And, as the defendant contends, the August 11 statement tells a story at odds with the one given by Ms. Joseph at trial.
Most significantly, in the statement the defendant does not appear at Ms. Joseph’s door at 10:30 p.m. carrying the gun. Instead, the gun was apparently left in the car. There is no mention in the statement of the defendant’s sigh of relief upon his return with the gun, or of the "smoking gun” conversation. Michael Dennis Hill, whom Pauline Joseph specifically testified was not present at 757 Beck Street at any *418 time that night, is not only present, according to this statement, but is the apparent shooter. Ms. Joseph herself, instead of searching the Maverick with Ila Mason and finding one bullet casing, now "cleans out” the car with the defendant, Fields, and Hill, and they remove the machine gun and multiple casings. There is no mention in the statement of the conversation in which Pauline Joseph says to the defendant, "I believe you did it” and his reply, "So what?”
At trial she also testified that the conversation about "finishing off” the Officers took place the night of May 20 (rather than May 19, as indicated in the statement), and that Hill was not present that night, either. The statement also appears to contradict Ms. Joseph’s general testimony that the defendant always kept the gun right next to him.
The People’s argument that the two versions are in fact consistent is too strained to accept; they flatly contradict each other on some points. It is true that not all of the omissions are necessarily inconsistencies. Some, however, such as the "smoking gun” and "so what” conversations, appear somewhat logically inconsistent with the August 11, 1971 version. Beyond the number of inconsistencies, though, is the significance of the events to which they relate.
At trial, Pauline Joseph gave an extremely detailed account of the events of that evening (May 19) and the following two days, describing the comings and goings of the various individuals to within a few minutes, repeating conversations word for word, and even remembering what was on television when certain events occurred. On cross-examination, defense counsel brought out certain inconsistencies between her testimony at trial and her earlier testimony before the Grand Jury and at the first trial. These included discrepancies as to when the defendant had left and returned, the order in which other individuals left and returned, with which of the others the defendant had certain exchanges, and who was present during certain conversations. In his summation, the prosecutor urged the jury to disregard these inconsistencies, which he described as merely the type of discrepancy in detail which one would naturally expect to occur in the retelling of an event. He urged the jury to focus instead on the key parts of her testimony, most specifically the gun. And indeed, in the context of her testimony, with the defendant loading the gun, leaving alone carrying it, and coming in alone carrying it, any discrepancies regarding the actions of the others do appear to be merely discrepancies in details.
*419 But the differences between the August 11, 1971 statement and her trial testimony go well beyond mere details. They involve what one would expect to have been the most memorable aspects of that night. If the defendant had been able to show that Ms. Joseph had in fact made this statement, there is a reasonable possibility it would have caused the jury to question seriously her over-all credibility. If the jury determined, as they well might have, that her memory of that night was so confused that she could not remember whether Michael Dennis Hill was never present at all, or whether he was not only present, but a main character, the apparent shooter, and she could not remember whether she herself searched the car with Ila Mason, finding one casing, or whether instead she had “cleaned out” the car of gun and casings with Fields, Hill, and the defendant, it would certainly raise reasonable doubts about her ability to recall accurately any of the particular events that occurred that evening. And, if the defendant was no longer necessarily the man with the gun, her description of his activities that evening might have been subject to the same sort of discrepancy as were the actions of the others. Given the narrowness of the circumstances necessary to place him in the car, the possibility of such discrepancies could raise a reasonable doubt as to the People’s theory.
The brief memorandum of her August 23 statement merely indicates that Ms. Joseph reiterated the same story about the defendant’s chiding of Hill the night of the shooting. As such, this statement adds little or nothing to the over-all picture.
On the other hand, the memorandum of Pauline Joseph’s June 18, 1971 statement to Agent Jimerson clearly would have been of impeachment value, and thus increases the cumulative likelihood that the verdict would have been affected. Her statement on June 18 that Eddie Joseph had not been at 757 Beck Street at any time between February and May 13, 1971 is at variance with her trial testimony that the defendant visited Eddie Joseph there many times during that period, each time carrying a machine gun. In the statement she also refers to an argument she overheard between Eddie Joseph and the defendant on the night of the shooting, yet she did not mention this argument in her detailed testimony of that night she gave at trial. She goes on to say that she believed the defendant was involved in the shooting on the basis of that argument. There is no mention of the defendant’s return that night with the machine gun, or of her own *420 conversations with the defendant. Finally, in the June 18 statement Ms. Joseph claims that she did not know Michael Dennis Hill. That statement obviously is inconsistent with her trial testimony as well as her August 11 statement.
Ms. Joseph’s August 10, 1971 statement to Agent Jimerson, which deals mainly with the night of May 21, 1971, does not contain any specific inconsistencies with her trial testimony and would not likely have been of much significance. Its only impeachment value would appear to be that, again, it describes certain events that were not mentioned in her very detailed testimony of that night.
The possibility that Augustus Qualls’ June 5 statement would have contributed to the verdict is remote. To be sure, in that statement Qualls maintained that he had never discussed the police shootings with the defendant, a claim which is inconsistent with his trial testimony. But it does not actually contradict his testimony as to their postarrest conversation— the one in which the defendant implied that he had knowledge of the machine gun’s use. Moveover, even if the jury were to discredit Qualls’ testimony in total, it is unlikely to have made any difference. It is highly likely that the jury would have inferred the defendant’s knowledge of the machine gun’s use in the shooting, anyway, from his participation in the letter writing combined with his possession of the gun on June 5. The only other significance of Qualls’ testimony was to establish that the defendant and Eddie Joseph had possession of the machine gun as early as 14 days, rather than 17 days, after the shooting.
The prosecution also advances the general argument that the production of any of these documents could not possibly have contributed to the verdict because the defendant had ample equivalent impeachment materials available at trial. However, unlike the situation in Bianco (183 AD2d 284, supra), the prosecution cannot point to any statements available to the defendant at trial which were similar to the cited portions of Pauline Joseph’s June 18 and August 11, 1971 statements. As stated above, the inconsistencies between her trial testimony and her earlier testimony before the Grand Jury and the first trial may be fairly characterized as details. But even some of those details might have been of far greater significance to the jury had they been aware of her August 11 statement. For example, her Grand Jury testimony that attributed to Hill, rather than the defendant, the quote, "Dammit, we’re going to kill them” or her Grand Jury testimony *421 that she sometimes saw the machine gun unattended on the sofa might have been used to greater advantage.
Equally unavailing is the prosecution’s contention that the "Target Blue” article was available to the defendant at trial and therefore took the place of Ms. Joseph’s FBI interviews. Since that article was not in the form of a prior inconsistent statement by Ms. Joseph, the attempt by the defense to enter it into evidence was denied. As the article did not even cite Ms. Joseph as a source, defense counsel was unable to cross-examine her effectively regarding its contents. The jury had no way of knowing that the inconsistent statements in "Target Blue” were Ms. Joseph’s own statements to the FBI. And, of course, the jury did not have an opportunity to include Ms. Joseph’s possible explanation of these inconsistencies in assessing her credibility.
In fact, the only material prior inconsistent statement by Pauline Joseph available at trial was her June 12, 1971 telephone call to the police. As the prosecution points out, that statement failed to sway the jury even though, unlike the other statements at issue here, it was exculpatory of the defendant. Nevertheless, it is certainly possible that the jury would have considered detailed interviews given to the FBI a month and a half after her decision to cooperate fully, and after she had testified in detail before the Grand Jury, in a different light from a brief general statement in an initial anonymous phone call.
The prosecution further contends that since the jury was aware that Ms. Joseph had lied, under oath, about her own prostitution conviction and had lied to welfare authorities, any additional impeachment evidence would have had a minimal effect. But this argument, too, must fail: the partially damaged witness is most susceptible to a new attack on credibility. True, it would have lessened the potential impact of the Rosario materials here if the jury had reason to believe that Ms. Joseph’s statements had been made during a particular period when she was not being honest about the case, and Ms. Joseph did testify that in her first two weeks of custody she was not fully cooperative. The June 18 statement was made during this initial period. Even as to that period, though, she described her failure to cooperate in terms of withholding information. The jury was never given any evidence that she engaged in the kind of active fabrication which would explain the narrative of her June 18 statement. Apart from the issue surrounding the initial telephone call, the *422 evidence before the jury was consistent with the prosecutor’s claim in summation that Ms. Joseph had never lied about anything but herself.

Conclusion

It is entirely possible, perhaps probable, that the production of these new Rosario materials would have had no effect on the verdict. The jury was aware that Pauline Joseph had lied under oath in the past. They were aware of her potential bias due to her relationship with Eddie Joseph. They observed her on the witness stand for nearly five days, 3 Vi of which were taken up by cross-examination. Obviously, they found her credible, despite her many shortcomings. And there was good reason to credit her testimony because much of it was corroborated by other evidence.
But to prevail on this motion, the defendant only has to establish a reasonable possibility of creating a reasonable doubt. That is not a high burden. As Judge Kaye wrote in People v Vilardi (supra, 76 NY2d, at 77), " 'reasonable possibility’ [is] * * * essentially a reformulation of the 'seldom if ever excusable’ rule.” I do not believe that these additional statements, added together, qualify for that narrow exception.
Even so, I acknowledge that this decision is not free from doubt. These Rosario materials do not contain any clearly exculpatory statements, nor any statements that would totally undermine a witness’s entire testimony. But they do include statements by Pauline Joseph which depart significantly from some of her most crucial testimony, and that testimony was essential to the People’s theory of the case. It follows, then, that there is a reasonable possibility of a different verdict if the defendant had been afforded the opportunity to cross-examine her with these statements.
To vacate a conviction some 20 years after the jury’s verdict on the basis of a possibility, however reasonable that possibility may be, is not a pleasant duty. But as Jackson (78 NY2d 638, supra) makes clear, the Rosario doctrine of basic fairness still applies in a postconviction setting. A conviction that can no longer be called a just conviction, and cannot pass this test of basic fairness, must be remedied no matter how much time has passed. While I find no reason to believe that the prosecutors have acted in bad faith, everyone who works in our system of criminal justice knows that a trial is not a fail-safe operation. And when the right to a fair trial has been compro *423 raised, a new trial must take place. The ancient writ of corara nobis requires no less.
Accordingly, the motion to vacate the defendant’s conviction is granted and a new trial is ordered. All other postconviction claims need not be addressed at this time.

 The testimony at trial was that the shooter was in the front passenger seat. Based on Officer Binetti’s description, the People argued that Fields was the driver. Two of the four eyewitnesses testified that they saw only two people in the car; Binetti testified affirmatively that there were no more than two. Of the two witnesses who testified that there were three occupants, one (Shakarian) said he saw the face of the rear passenger. It was stipulated at trial that Shakarian had failed to pick the defendant from a lineup in June 1971. Thus, while the People’s theory does not specifically depend on the defendant being the shooter, if Hill was the shooter it does present possible problems in proving that the defendant was in the car at all.