THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v HENRY HOWARD, Appellant.

First Department, April 8, 1987

**APPEARANCES OF COUNSEL**

*Bennett L. Gershman (Murray S. Bank* with him on the brief; *Murray, Bank & Sheer,* attorneys), for appellant.

*Mark Cammack* of counsel *(Susan Corkery* with him on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for respondent.

**OPINION OF THE COURT**

KASSAL, J.

The issue is whether, on defendant's motion under CPL 440.10, the prosecutor's failure to disclose certain material to the defense requires vacatur of the judgment of conviction, under the principles expressed in *Brady v Maryland* (373 US 83) and *People v Rosario* (9 NY2d 286, *cert denied* 368 US 866). On review of the entire record with respect to each of the documents, we find that there was no *Brady* violation and, applying the statutory standard in CPL 440.10, the motion to vacate was properly denied.

This was a murder case, which was tried twice, the first trial resulting in a hung jury and the second in a conviction for murder in the second degree and criminal possession of a weapon in the second degree. Defendant was sentenced to concurrent terms of 15 years to life and 1 year, respectively. His appeal from the conviction was unanimously affirmed (88 AD2d 1111) and leave to appeal to the Court of Appeals was denied by that court (57 NY2d 686).

At both trials, the prime witness for the prosecution was Dorothy Cooper, the common-law wife of the decedent, Neville Gratton, also known as Robert Gaston. Cooper testified that, on January 18, 1980, she was with Neville, the deceased, in their automobile, which was stopped in front of the Pink Angel Bar at 149th Street and St. Nicholas Avenue, when she observed defendant's vehicle approach in the opposite direction, make a U-turn and pull alongside Neville's vehicle. After a discussion between Neville and defendant, she observed defendant lean out of the car window and, although she did not see a gun, she heard a loud discharge and saw flame, following which Neville grabbed his chest and slumped back. He subsequently died at Columbia-Presbyterian Medical Center.

Cooper identified defendant, having recognized him because there had been a history of conflict between decedent and his

brother, George, on the one hand, and defendant and Arnold Scott, on the other hand. This conflict was fully explored at trial and bears upon the issues, not only with regard to the particulars of the prior events, but also in terms of establishing, at the time of the murder, the lengthy background and intense hostility between the two groups, decedent and his brother versus defendant and Scott.

Cooper and decedent resided at 51 St. Nicholas Place, where decedent's brother, George, also lived with his common-law wife. In 1979, defendant had been hired by the owners to manage and remodel the building and to collect rent. In September 1979, Cooper encountered defendant in the building and he claimed to be the new landlord. Later that month, defendant, accompanied by Scott and another man, demanded payment of rent from Cooper and from George's wife, Aida Gaston. However, he would not display any identification to prove that he was in fact the landlord and threatened to evict the tenants, stating that he would "get his crew" and bring his "motorcycle gang" to accomplish this. The dispute escalated into a fight: Neville and his brother were armed with knives; defendant's gold chain was ripped from his neck; and defendant drove his car toward George, but stopped when Neville smashed the windshield with a rock. Subsequently, that fall, Neville, George and their families vacated the apartment building but the conflict between the two groups continued, including a reckless pursuit for several blocks involving Neville, George, Scott and defendant, in four separate cars. In October 1979, defendant approached Neville and Cooper, questioned them with respect to the gold chain and threatened to burn Neville's car.

At trial, defendant denied any complicity in this shooting. He testified that during a portion of the time in issue he was at a friend's apartment with Scott, watching a basketball game. As noted, his conviction was unanimously affirmed and leave to appeal to the Court of Appeals was denied.

Subsequently, defendant made a request under the Freedom of Information Law for certain specified documents. Thereafter, in a motion pursuant to CPL 440.10, he claimed that the prosecutor's failure to turn over those documents amounted to a violation of the holding of *Brady v Maryland (supra)* which required vacatur of the judgment and a remand for a new trial. The alleged *Brady* violation was the only issue raised on the 440.10 motion with respect to the failure to produce the several documents set forth and described below:

# I - Brady v Maryland

## (A) *Toxicology Report*

Defendant contends that the prosecution failed to furnish him with a copy of the deceased's toxicology report, which should have been attached to the autopsy report, and which showed the presence of drugs in decedent's body. He claims that, had he been given this report, he would have been afforded greater latitude in cross-examining Cooper, the principal prosecution witness, as to her use of drugs which, in turn, could possibly show that her powers of perception might have been affected, thereby impairing her credibility. As an additional factor, he speculates that the discovery of drugs in decedent's body might indicate that this was a drug-related killing committed by others.

In our view, both claims are highly speculative and farfetched, and clearly do not constitute a sufficient basis to vacate the conviction. As held at Criminal Term, the mere fact that the decedent had controlled substances in his body does not give rise to any inference of drug use by his wife nor does it permit speculation that her perception was impaired at the time she observed the murder. Plainly, the toxicology report is not *Brady* material—it does not exculpate this defendant nor is it material in terms of credibility.

It is now well established that the *Brady* principle has been extended to require the prosecution to deliver, not only exculpatory matter, but also material evidence which impeaches the credibility of a prosecution witness *(United States v Bagley,* 473 US 667, 87 L Ed 2d 481; *Giglio v United States,* 405 US 150, 154; *People v Cwikla,* 46 NY2d 434, 441; *People v Wallert,* 98 AD2d 47, 50). However, a *Brady* violation does not automatically require a reversal and the direction of a new trial. The "mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *(United States v Agurs,* 427 US 97, 109-110.) In *Agurs,* it was held that, where there is a *Brady* violation, reversal is only required where the omitted evidence, evaluated in the context of the entire record, creates a reasonable doubt in terms of guilt. In order to prevail, the defendant must establish that the omitted evidence is material, i.e., that there is a reasonable probability that, had the evidence been disclosed, the result would have been different *(United States v Bagley, supra,* 473 US, at 682-683;

*see also, United States v Agurs, supra; Giglio v United States, supra,* at 154).

As applied here, the omission of the toxicology report was not "material". While respondent does not concede that the report was not delivered and claims that it was with the autopsy report, it cannot be said, even assuming there had been no disclosure, that there is a reasonable probability that the contents of the report would have led to a different verdict. Thus, it is neither exculpatory nor does it materially bear upon credibility so as to constitute *Brady* material.

(B) *Prior Police Complaints*

Defendant also contends that the prosecution failed to furnish him with copies of prior police complaint reports, UF 61, Nos. 6095, 6096 and 6122, all of which were complaints by the decedent. The first two, Nos. 6095 and 6096, are a complaint report and follow-up report, respectively, relating to an incident on September 27, 1979, when the decedent claimed that a man had harassed Cooper. Decedent charged that defendant had intimidated his wife, threatened her and displayed a gun. While the facts relating to the complaint were explored at length at the trial, defendant states he was never given a copy of the complaint form, which indicates that the incident was investigated by Detective Coppin, who concluded that it was "unfounded" and marked the case "closed".

The third report, No. 6122, was also a complaint by decedent that defendant and Scott had demanded that Neville move and that one of the men fired a sawed-off shotgun at him but missed. Detective Coppin also investigated this incident and, after finding no bullet holes or shells and interviewing Cooper, who told him that she heard no shots, he concluded that the complaint was unfounded and marked the case "closed". The events in this report were not testified to at trial.

Defendant argues that the reports are exculpatory because there are inconsistencies between report No. 6095 and Cooper's trial testimony and, further, had he been given the two reports, he could have argued that they establish a pattern of false complaints by decedent. While he does not deny that he knew the contents of the reports, he states he did not know their conclusions, i.e., that they had been marked "closed" and "unfounded".

■ Under the rationale of *Brady (supra),* the prior complaint reports are not exculpatory or material in terms of

credibility, since it is not "reasonably probable" that the outcome of the trial would have been different had they been disclosed *(United States v Bagley, supra)*. None of the reports include any exculpatory matter—Nos. 6095 and 6096 were fully developed at the trial and No. 6122 could not be used to impeach Cooper since she had told the investigating officer she heard no shots. Moreover, admission of No. 6122 would have been most damaging to the defense since it incorporates a claim by decedent that defendant or Scott had fired at him.

To the extent there were any inconsistencies, they are of a minor nature, relating to the name of the street (St. Nicholas Street versus St. Nicholas Place) and the absence in the report of the license number of the vehicle which Cooper noted when she saw defendant in the car, with a gun. Nevertheless, under *Brady*, the prior complaint reports are not material so as to require vacatur of the judgment, since it cannot be said that there is a reasonable probability that, had the reports been disclosed, the jury would have reached a different result. While they may have been of use in cross-examining Cooper, this alone does not establish them as *Brady* material.

In terms of materiality under *Brady* (373 US 83, *supra)*, it is clear that defendant knew the contents of the reports and it is conceded that the only fact he did not know was that the investigating detective had closed the file, finding the complaints to be without basis. Moreover, these reports were referred to in other reports, defendant was aware of them and could have requested their production. As noted, the first two complaints were explored at length at the first trial. Furthermore, defendant's freedom of information request was most specific, referring to the particular dates to which each complaint related, clearly demonstrating that he knew they existed.

(C) *Statement by Wallace Johnson*

Defendant's final contention is that the prosecution had improperly failed to disclose a statement by a witness who was at the murder scene but who was not a witness at the trial. This is the only document which might have some bearing on credibility. In opposition to defendant's prior motion to vacate the verdict, made before sentence, the prosecution had attached a report of an interview with one Wallace Johnson. Johnson stated that, after the shooting, a crowd formed around the car, which was double-parked on St. Nicholas Avenue, and, as he approached, he heard a female shout,

"They Shot Him! They Shot Him!" The woman was standing alongside the car, looking at the man behind the wheel, whose head was slumped back. Johnson pulled the man from behind the wheel and drove both to the hospital.

Defendant argues that this was an exculpatory statement by Cooper, since she had previously testified at the first trial that defendant was alone in the car at the time of the shooting. Criminal Term held that, although the report might have been useful in cross-examining Cooper, review of the entire record, in particular the prior history of verbal and physical conflict between the two groups (decedent and George versus defendant and Scott), established that the statement ("They Shot Him!") was of questionable impeachment value. It concluded that, in light of the hostility between these two groups, there was a basis for the statement and, in that context, it was not inconsistent with Cooper's testimony that defendant had shot her husband. Thus, the court held that the document was not material under *Brady,* since disclosure would not have created a reasonable probability of a different verdict.

■ We agree with that conclusion. Applying the "materiality" test of *Brady,* the statement "They Shot Him!", is not exculpatory, although it certainly could have been used for impeachment purposes. It is not exculpatory since the reference to "they shot" decedent does not exclude defendant as the person who actually fired the gun, especially taking into account the prior disputes and bad blood, including several confrontations between Neville, Howard and Scott, the latter two pursuing decedent in separate vehicles. Also, although Cooper testified at the first trial that Howard was alone in the car at the time of the shooting, this was not explored at the second trial. It does not appear from this record whether there was any testimony at the retrial as to whether Scott, defendant's crony, was present on the occasion of the murder.

Thus, the statement, "They Shot Him!", is not exculpatory since it does not suggest that defendant was not the actual perpetrator and disclosure would not appreciably affect the result in terms of guilt or innocence, a required finding under *Brady* in terms of materiality. Therefore, *Brady* does not mandate reversal as a consequence of the failure to disclose Johnson's statement. While not dispositive, in terms of the value of the statement for purposes of impeachment, we note that it does appear in a report by a police officer, not a witness at trial, relating to his interview of another nonwitness, who, in turn, said that he overheard the witness (Cooper)

state "They Shot Him!"—a form of double hearsay, which further impinges upon the admissibility of the statement on the issue of credibility *(cf., People v Chambers,* 125 AD2d 88 [1st Dept]).

## II - People v Rosario

Although defendant's motion was predicated solely upon the alleged *Brady* violations, Criminal Term *sua sponte* also considered the applicability of *People v Rosario* (9 NY2d 286, *supra).* It expressed the view that the reports were *Rosario* material, citing *People v Perez* (65 NY2d 154) wherein the Court of Appeals extended *Rosario* to embrace statements given to private parties, not involved in law enforcement or prosecution. Originally, the *Rosario* principle had been applied only to statements to the police, District Attorney, Grand Jury or the attorney for defendant but, as observed in *Perez,* the statutory codification in CPL 240.45 (1) (a) made no such distinction. Notwithstanding its finding that the reports were *Rosario* material, Criminal Term held that the failure to disclose here was harmless error and would not require a reversal since this case was tried before *People v Perez (supra).*

While we disagree with this conclusion, *Rosario (supra)* does not, in any event, apply here to require vacatur of the conviction. Clearly, the *Rosario* rule now extends to cover witness statements to private persons *(People v Perez, supra).* It has also been held that a failure to disclose *Rosario* material "constitutes per se error requiring that the conviction be reversed and a new trial ordered" *(People v Ranghelle,* 69 NY2d 56, 63; *People v Perez, supra,* at 160; *see, People v Mattiace Indus.,* 52 NY2d 739, 741; *People v Consolazio,* 40 NY2d 446, 454, *cert denied* 433 US 914; *People v Jones,* 128 AD2d 405). Thus, contrary to Criminal Term's holding in this case, even prior to *Perez (supra),* the harmless error analysis was held to be inapplicable to a *Rosario* violation.

Unlike the situation involved where there is a *Brady* violation, which involves a constitutional principle, the *Rosario* rule is based upon "policy considerations" and "a right sense of justice" *(People v Rosario, supra,* at 289). *Rosario,* it has been held, is grounded upon a fairness doctrine, not constitutional mandates or guarantees *(People v Pinion,* 56 AD2d 664; *People v Beal,* 57 AD2d 306, 309; *People v Hicks,* 85 Misc 2d 649, 651; *People v Lunney,* 84 Misc 2d 1090, 1093; *People v Pellegrino,* 86 Misc 2d 306, 309). As a result, there does appear

to be some inconsistency in the application of the two rules since, as to *Brady,* it must be demonstrated that there is a reasonable probability that disclosure would have changed the result, whereas nondisclosure of witness statements under *Rosario,* per se, requires that the conviction be reversed. This is so, notwithstanding that *Brady* is a rule of constitutional magnitude.

 Nevertheless, despite the difference in approach with regard to *Rosario,* as opposed to *Brady* material, which we are required to follow, the *Rosario* rule should not apply to this appeal from the denial of defendant's postjudgment motion pursuant to CPL 440.10. In *Rosario (supra)* and in each of the cases subsequently decided by the Court of Appeals, the court had before it direct appeals from judgments convicting defendant after trial. No cases have been cited involving the situation presently before us, namely, an appeal from a denial of a motion under CPL 440.10. Bearing in mind the operative standard to be applied on such a motion, as discussed below, we conclude that the per se *Rosario* rule should not apply.

On a CPL 440.10 motion, relating to newly discovered evidence not admitted at the trial, it must appear that the evidence is of such character "as to create a probability that had such evidence been received at the trial the verdict would have been more favorable to the defendant" (CPL 440.10 [1] [g]), somewhat akin to the reasonable probability standard under *Brady,* which, as discussed, was not met here. Examination of the statute (CPL 440.10) discloses no category specifically geared to a *Rosario* violation (other than as newly discovered evidence under CPL 440.10 [1] [g]), which may explain why, in this case, defendant did not predicate the motion on *Rosario,* but instead, relied exclusively on the alleged failure to disclose *Brady* material, a claim clearly within the scope of CPL 440.10 (1) (d).

Our courts have consistently held that, on a postjudgment motion based upon newly discovered evidence, it must be demonstrated that introduction of the evidence would probably change the verdict *(see, People v Salemi,* 309 NY 208, 216, *cert denied* 350 US 950; *People v Priori,* 164 NY 459, 472; *People v Earley,* 118 AD2d 868; *People v Scarincio,* 109 AD2d 928, 929; *People v Porter,* 93 AD2d 943, 944). This has always been the operative standard *(People v Henry,* 127 App Div 489, 491-492 [1908]; *People v Bonifacio,* 119 App Div 719, 723, *affd* 190 NY 150 [1907]). These and other cases have recognized that in a posttrial motion to vacate a conviction under CPL

440.10 (1) (g), to be newly discovered, the evidence must be more than merely contradictory and impeaching of testimony at the trial *(People v Powell,* 96 AD2d 610; *People v Wood,* 94 AD2d 849, 850).

Applying that same standard here, we do not consider the failure to disclose any of the statements as requiring vacatur of the judgment since there is no reasonable probability that their production would have resulted in a different verdict. Aside from this, most of the documents are not *Rosario* material, which relates only to the statements of witnesses. Clearly, the toxicology report and the statement by the non-testifying witness Wallace Johnson do not fall within this category.

■ Similarly, the prior police complaints, Nos. 6095, 6096 and 6122, are not *Rosario* statements by the witness, Cooper, since they were complaints made by the decedent. To the extent that they contain statements by Cooper to the investigating officer, those encompassed within Nos. 6095 and 6096 were fully explored at trial and, therefore, as with the statement in 6122, that Cooper did not hear any shots fired, they could not have been employed for impeachment purposes. Moreover, none of the three police complaints relate to the commission of this crime and, therefore, they are not relevant to the subject matter of Cooper's testimony, a necessary criteria in terms of applying the *Rosario* principle *(see, People v Poole,* 48 NY2d 144, 149). In any event, it is clear that production of the prior complaint reports, at or before trial, would not have led to a verdict more favorable to the defendant.

■ In our view, the same holds true with respect to the statement by Johnson to the officer as to what he overheard the witness Cooper say. While this could have been used on cross-examination on the issue of credibility, we do not consider that there is a reasonable probability that the jury would have acquitted, especially considering the prior history of hostility between the two factions. In addition, taking into account the double hearsay nature of the statement, we are not persuaded that Cooper's statement was admissible *(cf., People v Chambers,* 125 AD2d 88, *supra)* nor does it appear to be a "witness" statement under *Rosario.* Each of the cases dealing with the *Rosario* issue involve statements by a witness on the witness stand to someone. This is not the type of situation here—a written entry by a nonwitness (the officer) that another nonwitness (Johnson) told him that he heard the

prosecution witness (Cooper) exclaim, "They Shot Him!" Thus, factually, the statement involved in this case is not similar to those in any of the decisions thus far reported, although, for the above reasons, this issue need not be reached since, clearly, disclosure would not have materially changed the result.

 Therefore, we hold that the per se *Rosario* rule, limited to an appeal from a judgment of conviction, does not apply to this appeal from the denial of a CPL 440.10 motion. Applying the statutory standard on such a motion—that it is reasonably probable that disclosure of any of the documents would have led to a different verdict—we are in agreement that the motion to vacate the conviction was properly denied.

Accordingly, the order, Supreme Court, New York County (Carol Berkman, J.), entered May 8, 1986, denying defendant's motion pursuant to CPL 440.10 to vacate the judgment of the same court (Benjamin Altman, J.), rendered August 25, 1981, which, after a jury trial, convicted defendant of murder in the second degree and criminal possession of a weapon in the second degree and sentenced him to an indeterminate term of 15 years to life on the murder conviction and a concurrent definite term of 1 year on the weapons conviction, should be affirmed.

SANDLER, J. P., ROSS, ASCH and WALLACH, JJ., concur.

Order, Supreme Court, New York County, entered on May 8, 1986, unanimously affirmed.