Fernandez v. Capra

# United States Court of Appeals
# for the Second Circuit

AUGUST TERM 2018
No. 16-4053

PABLO FERNANDEZ,
*Petitioner-Appellant,*

*v.*

MICHAEL CAPRA,
*Respondent-Appellee,*

CHRISTOPHER ARTUZ, PHILIP HEATH, CHARLES GREINER,
*Respondents.*

ARGUED: DECEMBER 12, 2018
DECIDED: FEBRUARY 22, 2019

Before:      JACOBS, CALABRESI, *Circuit Judges*; RAKOFF,* *District Judge*.

Pablo Fernandez appeals from a judgment of the United States District Court for the Southern District of New York (Wood, <u>J.</u>, on recommendation from Gorenstein, <u>J.</u>), denying his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The district court concluded that the high bar for relief under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") was not satisfied, and rejected Fernandez's claims that: (i) the prosecutors violated his <u>Brady</u> rights, and (ii) the prosecutors violated his right to a fair trial by knowingly offering perjured testimony at his trial. We agree with the district court that the state courts properly rejected Fernandez's <u>Brady</u> claim. However, we conclude that the state courts unreasonably determined the facts in light of

*Judge Jed S. Rakoff, of the United States District Court for the Southern District of New York, sitting by designation.

the evidence presented in the state court proceeding when it rejected Fernandez's fair trial claim. Accordingly, we reverse and remand the judgment of the district court, with direction to comply with our February 5, 2019 order.

<div style="margin-left:40%">

MAIA S. LICHTENSTEIN (WITH DAVID W. BROWN, DANIEL J. BELLER, JONATHAN SILBERSTEIN-LOEB ON THE BRIEF), PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, NEW YORK, NY.

SHEILA ANNE MARIE O'SHEA, ASSISTANT DISTRICT ATTORNEY, FOR CYRUS VANCE, DISTRICT ATTORNEY FOR NEW YORK COUNTY, NEW YORK, NY.

</div>

DENNIS JACOBS, *Circuit Judge*:

The petitioner, Pablo Fernandez, brings suit under § 2254 challenging his state court conviction for murder-for-hire. Fernandez was convicted by a jury of murdering Manny Quintero, a member of a rival gang. Fernandez argues that he is entitled to a writ of habeas corpus on two bases. *First*, Fernandez claims that his rights under Brady v. Maryland, 373 U.S. 83 (1963), were violated because the prosecutors failed to promptly disclose evidence that the lead investigator on his case, Albert Officer Melino, had been caught selling cocaine to an undercover police officer before he joined the New York Police Department ("NYPD"). *Second*, Fernandez claims that the prosecutors violated his right to a fair trial by knowingly offering perjured testimony of two eyewitnesses--Jesus Canela and

2

Hickliff Rosario, both of whom recanted years after the trial and claimed that Officer Melino had pressured them into accusing Fernandez.

The New York State Supreme Court rejected Fernandez's claims. As to the Brady claim, the state court held that the prosecutors' duty to disclose the evidence of Officer Melino's prior criminal activity was not triggered until two days after Fernandez was convicted, and was promptly disclosed then. The court also concluded that there was no reasonable probability that this evidence would have changed the outcome of the trial in any event, because of the overwhelming evidence of guilt, including identifications by four eyewitnesses. As to the fair trial claim, the state court found that the recanting witnesses were not credible, and therefore concluded that the prosecutors had not offered perjured testimony at Fernandez's trial.

Fernandez filed a § 2254 petition in the United States District Court for the Southern District of New York, claiming that the state courts erred in denying relief. The district court (Wood, J., on recommendation of Gorenstein, M.J.) denied the petition, concluding that the high bar for relief under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") was not surmounted.

3

We conclude that state courts reasonably applied clearly established federal law by: (1) denying Fernandez's Brady claim on the ground of materiality; and (2) denying Fernandez's motion for a new trial based on the recantation of Hickliff Rosario. However, we conclude that the state court's rejection of Jesus Canela's recantation--in part premised on the finding that Canela was "trying too hard to be convincing," App'x 44--was an "unreasonable determination of the facts in light of the evidence presented," 28 U.S.C. § 2254(d), and therefore that the state court unreasonably denied Fernandez's (second) motion for a new trial. Accordingly, we reverse.

## I.  BACKGROUND

### A. The Crime and Investigation

Fernandez was convicted of murdering Manny Quintero. The circumstances of the murder are as follows.

On June 10, 1993, Quintero was standing outside an apartment building at 504 West 135th Street at Amsterdam Avenue. At approximately 6:00 p.m., a car arrived at the block, and a man jumped out of the passenger side. He fired several shots, killing Quintero, and injuring a bystander, Henry Gomez. The shooter got back into the car, and drove away. Neither the shooter nor the driver of the car was apprehended at that time.

4

The police interviewed several of the bystanders, including two teenage brothers, Hickliff and George Rosario, who were cousins of Quintero. Hickliff (we refer to the brothers by their first name) signed a written statement in which he described the shooter as a white Hispanic male, approximately 35 years old, about 5'8'' tall, and with gray hair tied in a ponytail. Hickliff was also brought to the police station and shown a photo array that did not include a picture of Fernandez. He selected a picture of a gray-haired man who he claimed looked like the shooter but was not the shooter. George was also brought to the police station and shown three photographs, none of Fernandez. He did not identify any of the men as the shooter. The investigation stalled, and the case went cold.

Two years later, Officer Albert Melino, an investigator at the NYPD Homicide Investigation Unit, renewed the search for Quintero's killer, based on information provided by two cooperators, Martin Mejias and Raymond Rivera, who identified Fernandez as the murderer hired for $2,500 by one Jose Luis Marte to kill Quintero. Marte had murdered a relative of Quintero, and feared retaliation. Neither of them observed the murder, but Mejias reported to Officer Melino that Fernandez had confessed to him.

As part of his re-investigation, Officer Melino met with the Rosario brothers at their home in April 1995. They confirmed that they had witnessed the murder, and described what they had seen that day. Officer Melino showed Hickliff a photo array, and Hickliff identified Fernandez as the shooter. At a later meeting, George was also shown a photo array, and identified Fernandez as the shooter. On July 20, 1995, Officer Melino brought the brothers to the District Attorney's Office to separately show them a line-up. Both identified Fernandez as the shooter. Later, in recantation, the Rosario brothers averred that their identification of Fernandez was procured by Officer Melino's improper suggestions and cues.

Officer Melino had also been canvassing the neighborhood for additional witnesses. Two weeks before trial, in January 1996, he located two new eyewitnesses: Jesus Canela and Manuel Medina. Canela, a teenager, told Officer Melino that he had observed the murder, and described the shooter as 30-40 years old, 5'11'', and with gray hair in a ponytail. Canela had never spoken to any law enforcement about the murder. Medina reported to Officer Melino that he saw the shooter fleeing in the passenger seat of a car that was stopped at a red

light in front of where Medina was sitting.  Medina reported that the passenger was wearing dark clothing and had medium-length brown or gray hair.

## B.  The Trial

Fernandez went on trial in February 1996.  The following evidence was presented.  (As discussed more below, some of this testimony was later recanted.)

The prosecution offered testimony from Rivera and Mejias, who testified that Marte had hired Fernandez to kill Quintero.  Rivera testified that he met up with Fernandez and Marte after the murder, and that Fernandez told them that he shot Quintero and "left him like a piece of shit on the floor."  App'x 1023.  Mejias testified that he observed Marte give Fernandez money at Marte's home less than a month after the murder.  Neither Mejias nor Rivera observed the murder.

Four eyewitnesses testified: Hickliff, George, Canela, and Medina.

Hickliff testified that he was playing basketball near 504 West 135th Street when a car pulled up in front of the building, and a man emerged and began shooting.  He identified Fernandez as the shooter.  He also testified that he identified Fernandez as the shooter in a lineup prior to trial.

7

George testified that he was riding his bicycle on West 135th Street when he saw a car make a U-turn on the block and a man get out. The man fired four or five shots, and George saw Quintero run toward the building. He identified Fernandez as the shooter. George also testified that he identified Fernandez in a lineup prior to trial.

Canela testified that he was standing in front of 504 West 135th Street when he saw a car pull up in front of the building. A man got out and started shooting an Uzi. He identified Fernandez as the shooter, and testified that he recognized his nose, his eyes, and his mouth. He denied ever viewing a photo array or lineup.

Medina testified that he was playing dominos at the scene when he heard gun shots. In the passenger seat of a car driving down the street at a low speed, Medina recognized the right profile of Fernandez's face, including his cheek bones, his eyebrows, jaw, nose, and ear. He recalled that the passenger's hair was brown or gray.

The second victim of the shooting, Henry Gomez, did not testify at Fernandez's trial because he could not be located.

The defense case primarily focused on the differences between Fernandez's appearance at the time of the shooting (he was a dark-skinned Hispanic, in his 20s, with short hair) and the description of the shooter given by the eyewitnesses to the investigators, who described the shooter as a light-skinned Hispanic male, 30-40 years old, and wearing his gray hair in a ponytail. A defense witness testified that Fernandez had short hair, and never wore his hair in a ponytail. Fernandez also offered one eyewitness who testified that Fernandez was not the shooter.

On February 6, 1996, Fernandez was convicted of Quintero's murder. He was sentenced to 25 years to life.

### C. Post-Trial Proceedings

On February 15, 1996, nine days after the trial concluded, the prosecution disclosed to the defense that, on February 9, Officer Melino had been arrested and charged with Criminal Sale of a Controlled Substance. The charges stemmed from events that took place in 1991 and 1992, before Officer Melino had entered the police academy. The prosecutors had obtained videotape and audiotape evidence from New York State troopers in which Officer Melino sold a half a kilogram of cocaine to an undercover cop.

The defense filed a motion to set aside the verdict, arguing under <u>Brady</u> that the prosecution violated his rights by failing to promptly disclose criminal conduct by the lead police investigator. The state court held a hearing, at which the Chief of the Official Corruption Unit of the New York District Attorney's Office, William Burmeister, set forth the timeline of the discovery of Officer Melino's criminal wrongdoing, and offered evidence that the prosecutors had no more than speculative evidence of the drug sales prior to February 8, two days after Fernandez was convicted.

The state court found no <u>Brady</u> violation because the prosecutors disclosed the evidence promptly after Melino was arrested, and ruled that any <u>Brady</u> violation would have been harmless in any event, because trial evidence of guilt was overwhelming. The Appellate Division, First Department unanimously affirmed the conviction on the ground of harmlessness only. A judge on the Court of Appeals denied leave to appeal.

Seven years later, in 2003, Fernandez filed his first motion for a new trial. The motion was supported by affidavits in which the Rosario brothers recanted their identification of Fernandez, and swore that their pre-trial identifications of Fernandez in the photo array and at the line-up were coerced by Officer Melino.

10

Fernandez also offered an affidavit from Gomez (the second victim of the shooting), who swore that Fernandez had not shot him.

After a hearing at which Hickliff and Gomez testified, the state court found that Hickliff's recantation and Gomez's negative identification were not credible, and that there was therefore no basis for a new trial. The Appellate Division, First Department unanimously affirmed, and a judge on the Court of Appeals denied leave to appeal.

Another four years later, in 2010, Fernandez filed a second motion for a new trial. In support of this motion, Fernandez offered an affidavit in which Canela also recanted his identification of Fernandez, and also claimed that his accusation was coerced by Officer Melino. The trial court held another hearing and heard testimony from Canela. The court again denied the motion, finding that Canela's recantation was not credible, and therefore that there was no basis for a new trial. The Appellate Division, First Department denied leave to appeal.

### D. Current Proceedings

On October 10, 2000, Fernandez filed a § 2254 petition for a writ of habeas corpus in the Southern District of New York. There is no point in recounting the full procedural history of this case. As relevant to this appeal, on August 30,

11

2013, Fernandez filed a Third Amended Petition for a writ of habeas corpus, arguing that: (i) the prosecution violated his Brady rights; and (ii) the prosecution violated his right to a fair trial by procuring and knowingly using false testimony at trial.  On October 9, 2014, Magistrate Judge Gorenstein issued a Report and Recommendation concluding that the petition did not satisfy the high standard for relief under AEDPA.  Judge Wood adopted the recommendation, largely for the same reasons, and entered judgment in favor of the respondents.

This appeal ensued.

## II.   STANDARD OF REVIEW

AEDPA instructs federal courts in habeas cases to give great deference to state court decisions when those decisions are "on the merits." 28 U.S.C. § 2254(d). In such cases, we may grant a habeas petition only if the state court decision:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Id.[1]  The standard for granting the writ is deliberately "difficult to meet and highly deferential."  Contreras v. Artus, 778 F.3d 97, 106 (2d Cir. 2015) (internal punctuation omitted) (quoting Cullen v. Pinholster, 131 S. Ct. 1388, 1398 (2011)).

The petitioner's claims were adjudicated on the merits in the state court proceedings.

### III.  BRADY

"There are three components of a true Brady violation: [1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued."  Strickler v. Greene, 527 U.S. 263, 281–82 (1999).

Fernandez argues that the state court unreasonably applied clearly established federal law when it concluded: (i) that, because the prosecutors promptly disclosed the evidence of Officer Melino's misconduct to his counsel,

---

[1] Section 2254(e)(1) also provides a standard for evaluating a state court's findings of facts:  "[A] determination of a factual issue made by a State court shall be presumed to be correct" unless the petitioner rebuts that presumption "by clear and convincing evidence."  The Supreme Court has declined to define the "precise relationship between § 2254(d)(2) and § 2243(e)(1)."  Brumfield v. Cain, 135 S.Ct. 2269, 2282 (2015).  We proceed under the assumption that "satisfaction of either inquiry is sufficient."  Channer v. Brooks, 320 F.3d 188, 194 (2d Cir. 2003).

there was no <u>Brady</u> violation; and (ii) that any <u>Brady</u> violation was, in any event, harmless.

**A.**

As to the timing of the disclosure, the only witness at the state court hearing was the Chief of the Official Corruption Unit of the New York County District Attorney's Office, William Burmeister, who offered the following testimony.

Fernandez's trial ended in the jury verdict on February 6. On January 30, 1996, Burmeister learned in an internal NYPD meeting that the Internal Affairs unit had received a "log" that morning that Officer Melino had been involved in the sale of narcotics. The tip had come from the New York State troopers, who had initially conducted the investigation. On February 5, Burmeister met with the NYPD officers who had interviewed the troopers. The NYPD officers reported that they had been told that Officer Melino had been investigated in 1991 and 1992 regarding the sale of 500 grams of cocaine, as well as proposed additional sales of additional kilos of cocaine.

On February 6, Burmeister interviewed the state troopers, one of whom had negotiated the drug sale with Officer Melino while undercover. The

14

troopers also brought tapes, photographs, and documents that supported their allegations, and Burmeister reviewed at least part of one of the tapes at the meeting. The same day, the troopers provided copies of all of the tapes to the NYPD Internal Affairs Unit. Burmeister began reviewing the tapes on February 7, he finished his review on February 8, and ordered Officer Melino's arrest that same day. The prosecutors disclosed the arrest to Fernandez's counsel on February 15.

The state court denied the <u>Brady</u> motion, concluding that the prosecutor's duty to disclose the evidence was not triggered until February 8, 1996 (two days after the jury verdict), because until then the evidence of Melino's drug dealing was only speculative, and because the prosecution disclosed the evidence promptly thereafter. [2] <u>See</u> <u>United States v. Agurs</u>, 427 U.S. 97, 109 n.16 (1976)

---

[2] The state court stated in full:

> In the instant case, ADA Burmeister had only an unconfirmed allegation that Officer Melino had sold narcotics approximately four years ago to an undercover New York State trooper. The court finds that after receiving this information on January 30, 1996, ADA Burmeister investigated the allegations in an expedient and professional manner. He met with the law enforcement agents involved in the investigation including the undercover officer, examined the documents available and listened to the audiotapes. Once he decided that the allegations had merit, he ordered that the defendant be arrested and the arrest took place on

(noting that the prosecution need not disclose "preliminary, challenged, or speculative information"). Fernandez argues that this was an unreasonable application of clearly established federal law. We agree.

On February 6, Burmeister met with the two State Troopers who had investigated Officer Melino, including the trooper who negotiated the narcotics sale with Officer Melino while undercover, and questioned the troopers "at some length." App'x 1342. Having spoken to the state trooper who actually participated in the drug sale with Officer Melino, Burmeister's knowledge of Officer Melino's wrongdoing was no longer "preliminary, challenged, or

February 9, 1996. The People promptly notified defense counsel that Officer Melino had been arrested.

The court finds that the People's <u>Brady</u> obligation was not triggered until February 8, 1996, the day the People reviewed the audiotapes and concomitantly ordered the arrest of the defendant. Up to this point, the court finds that the allegations were presumed to be more a matter of supposition than substance. Thus, since the People were under no duty to disclose this information to the defendant until February 8, 1996, which was after the jury reached its verdict, the defendant's motion is denied.

App'x 1392.

speculative". <u>Agurs</u>, 427 U.S. at 109 n.16. The source was sufficiently credible to trigger a disclosure obligation on February 6.

The state court concluded that "[t]he People's <u>Brady</u> obligation was not triggered until February 8, 1996, the day the People reviewed the audiotapes and concomitantly ordered the arrest of the defendant." App'x 1392. The state court found that Burmeister "investigated the allegations in an expedient and professional manner." App'x 1392. But while Burmeister may have reasonably sought a high degree of certainty in the credibility of the accusation before ordering the arrest of a NYPD officer, it was not reasonable for Burmeister to delay the disclosure to Fernandez of credible evidence from an undercover officer that Officer Melino had negotiated a sale of cocaine.

The state court also relied on Burmeister's skepticism of the allegations against Officer Melino. <u>See</u> App'x 1391 ("ADA Burmeister testified and the court finds as a fact that he did not attempt to contact anyone regarding Melino prior to reviewing the audiotapes because he assumed that law enforcement officials would have followed up on this information sooner if it were reliable."). But "if there were questions about the reliability of the exculpatory information, it was the prerogative of the defendant and his counsel--and not of the prosecution--to

17

exercise judgment in determining whether the defendant should make use of it."

DiSimone v. Phillips, 461 F.3d 181, 195 (2d Cir. 2006).

Accordingly, we conclude that the state court's determination that no

Brady obligation arose until February 8, 1996 was an unreasonable application of

clearly established federal law.

**B.**

However, the state court denied the motion on the alternative ground that

any Brady violation was, in any event, harmless.[3] This was a reasonable

application of clearly established law.

---

[3] The state court concluded:

> Impeachment material may be exculpatory in some cases as probative of the credibility of a witness, especially where the testimony is critical to the People's case. See People v. Steadman, supra. However, Melina's testimony was largely collateral to the issues at trial. He did not testify to seeing the defendant commit the murders or fleeing the scene but told the jury of his unsuccessful attempts to locate certain witnesses. Instead, the People called four eyewitnesses to the shooting and one witness who was present when the defendant bragged about committing the murder.
>
> In light of this evidence against the defendant, defense counsel's claim that she would have employed a different trial technique is spurious. The main witnesses against the defendant were the four witnesses to the homicide and the witness who discussed the defendant's admissions. Officer Melino's prior drug sale is totally irrelevant to this critical testimony and would have been of no avail to counsel in cross examining these witnesses.

18

Fernandez argues that evidence of Melino's drug deals would have been powerful impeachment material at his trial. The state court acknowledged that "[i]mpeachment material may be exculpatory in some cases as probative of the credibility of a witness, especially where the testimony is critical to the People's case." App'x 1393. But the court reasonably concluded that the impeachment material would have been of little value to Fernandez's counsel given that Melino's testimony was "largely collateral to the issues at trial", "ministerial in nature", and "totally irrelevant to th[e] critical testimony" "of four witnesses to the homicide and the witness who discussed the defendant's admissions."

---

Finally, as the People indicate in their response, if they knew of the allegation against Officer Melino, they would not have called him as a witness since his testimony was cumulative.

The court finds that Melino's testimony was ministerial in nature and not material to the issue of the defendant's guilt. Furthermore, the charges against Melino involve activities that occurred allegedly prior to his becoming a police officer. In evaluating the allegations against Melino and the limited nature of his testimony, the court finds that had the defense been aware that Officer Melino was accused of selling a half-kilo of cocaine in 1991/92, prior to becoming a New York City Police Officer, there is no reasonable probability or possibility that the result would have been different. Although the defendant may have found some productive use of the undisclosed information concerning Melino, that is simply not enough to transform it into Brady material. See People v. Howard, 127 A.D.2d 109 (1st Dep't 1987).

App'x 1393.

19

App'x 1393. A review of the record reveals that this characterization of Officer

Melino's testimony (and the other evidence offered at trial) is well-supported.

Officer Melino testified at trial primarily about his work on the investigation,

including his efforts to locate witnesses and his assistance in arranging lineups

for Hickliff and George. And, at the time the state court considered this motion,

there were four eyewitnesses who had unequivocally identified Fernandez as the

shooter.

On appeal, Fernandez argues that his trial counsel might have uncovered

evidence of witness tampering if his counsel had cross-examined Officer Melino

about his prior drug sales. But the state court reasonably credited the State's

assertion they would not have called Officer Melino as a witness if they knew of

the drug allegations against him. Moreover, the bad act evidence that would

have been used to impeach Officer Melino (sale of drugs) does not directly

implicate the allegations of wrongdoing at trial (suborning perjury), making it

less likely that cross-examination would have achieved such a revelation.

Fernandez points out that the recantations by the Rosarios and Canela

support his argument that his attorneys would have discovered investigative

misconduct if they were aware of Officer Melino's drug dealing. But at the time

the state court made its decision, these witnesses had not recanted, and, as the

First Department then noted, "[t]here is not one iota of evidence that the

identifications were the product of coercion or suggestion, or that Melino

harbored some secret motive to influence four witnesses to falsely implicate the

defendant." App'x 1444. We review the reasonableness of the state court's

decision based on the evidence available to the state court at the time it decided

the motion. Given that there was no evidence of such misconduct at the time it

denied this motion, the state court acted reasonably.

Accordingly, the state court's denial of Fernandez's motion to set aside his

conviction on the basis of Brady was in no way an unreasonable application of

clearly established federal law.

## IV.

Fernandez filed two motions for a new trial on the ground that the

prosecutors violated his right to a fair trial by knowingly offering perjured

testimony at his trial. On this appeal, he argues that the state court's credibility

findings in these decisions were "unreasonable determination[s] of the facts in

light of the evidence presented at the State court proceeding." 28 U.S.C.

§ 2254(d).

21

"In order to be granted a new trial on the ground that a witness committed perjury, the defendant must show that (i) the witness actually committed perjury; (ii) the alleged perjury was material; (iii) the government knew or should have known of the perjury at [the] time of trial; and (iv) the perjured testimony remained undisclosed during trial."  United States v. Cromitie, 727 F.3d 194, 221 (2d Cir. 2013) (alteration in original) (quoting United States v. Josephberg, 562 F.3d 478, 494 (2d Cir. 2009)).

**A.**

Fernandez's first motion for a new trial, filed in 2003, was supported by affidavits from the two Rosario brothers, in which they recanted their identification of Fernandez as the shooter at trial, and swore that their pre-trial identifications of Fernandez in the photo array and at the line-up were coerced by Officer Melino.  Fernandez also offered an affidavit from the second victim of the shooting, Henry Gomez, who swore that the person who shot him was not Fernandez.  Gomez had not been located at the time of Fernandez's trial.

The state court held a five-day hearing on the motion at which, among others, Hickliff and Gomez testified.

22

Hickliff testified that he lied when he testified at Fernandez's trial; that, contrary to his trial testimony, Fernandez was not the shooter; and that "[e]verything is different" about the appearance of the shooter as compared to Fernandez.  App'x 1683.  As to his photo array identification, Hickliff testified that he "d[id]n't see the shooter [in the photo array]," but was convinced to choose Fernandez's photo by Officer Melino, who "had his finger on number four like that so [Hickliff's] focus was just there."  App'x 1673-74.  He identified Fernandez at trial because he was "brain-washed, you know, to pick him out," and "never believed it [was him]" but he "just went along with what the detective was telling [him]."  App'x 1685.

Gomez testified that, on the day of the murder, he was standing in front of 504 West 135th street when "a car pulled up and a man came out and with a like a type of like an Uzi and he started shooting us all."  App'x 1549.  He testified that he "g[o]t a good look at the man who got out of the car," and that it was not Fernandez, who did not look "anything like [the man who shot him]."  App'x 1550-52.  Gomez decided to testify after two of Fernandez's relatives approached him in prison (where he was serving a term for kidnapping), and showed him a picture of Fernandez, and explained that he had been convicted of Quintero's

23

murder.  Gomez told them that Fernandez was not the shooter, and agreed to testify in this case "[b]ecause [he] want[ed] to free someone who is innocent." App'x 1563.

The Government called Detective Connolly, the NYPD officer who investigated the recantations of George and Hickliff.  Detective Connolly testified that he met with Hickliff in August 2004, that Hickliff said that he had gone to Fernandez's lawyer's office with his mother (and Fernandez's mother), and that he signed a piece of paper that he had not read to "avoid [a] confrontation." App'x 1790-91.  He also told Connolly that a man "started coming around the neighborhood looking for him, [who h]e believed . . . to be a relative of Pablo Fernandez,"  App'x 1791, and who had "offered him some money to stay involved in it, but he refused the money and did not take it,"  App'x 1791. Hickliff also told Connolly that he had told the truth at trial when he accused Fernandez.  At the same hearing, Hickliff denied making any of these statements to Connolly.

George Rosario did not testify at the hearing, and the state court's decision did not address his affidavit in which he recanted.

24

The state court found that Hickliff's recantation was incredible and that there was therefore no basis to find that the prosecutor had offered perjured testimony at Fernandez's trial:

> I did not find Mr. Rosario to be a credible witness. While he testified that the defendant was not the shooter and described the identification process, he avoided virtually every other question that was put to him, claiming a lack of memory even as to recent events. I also found credible Detective Connelly's account that Mr. Rosario had made statements several months earlier that contradicted his testimony at the hearing. . . . Given Hickliff Rosario's lack of credibility, I do not believe his recantation testimony would be likely to affect the verdict.

App'x 35.[4] This was not an unreasonable finding in light of the evidence presented at the hearing.

The record supports the state court's finding that Hickliff was extremely evasive during his testimony. Among other things, Hickliff did not remember: particulars of the meeting at which he signed his recantation affidavit; details from his affidavit; what he did when he walked into court on the morning of his

---

[4] The state court also denied Fernandez's motion for a new trial on the basis of new evidence, finding that Gomez's testimony was incredible, and therefore that Fernandez had not established that the "new evidence is of such a character as to create a probability that . . . the verdict would have been more favorable to the defendant." App'x 35. Fernandez does not collaterally appeal the denial of his motion on this ground.

25

testimony; and anything about his initial meeting with the private investigator to whom he recanted.

The state court's finding that Detective Connolly's testimony was credible was supported by Connolly's clear memory of the details of the meeting he attended with Hickliff and what Hickliff told him at that meeting (including that Hickliff had signed an affidavit that he hadn't read and that he did not lie at Fernandez's trial). That testimony was supported by a memorandum that Detective Connolly wrote soon after he met with Hickliff. Moreover, Connolly's testimony--specifically, that Hickliff admitted to receiving an offer of money to recant--supplied a motive to lie, notwithstanding Hickliff's statement that he refused the money.

Accordingly, we defer to the state court's reasonable finding that the recantation of Hickliff was not credible, and conclude that the state court reasonably denied Fernandez's motion for a new trial.

**B.**

Fernandez's second motion for a new trial, filed in 2010, was supported by an affidavit from Jesus Canela, which recanted his identification of Fernandez

26

and claimed that Officer Melino had coerced his accusation. The state court held a five-day hearing, at which the following evidence was offered.

**1.**

Canela testified that he identified Fernandez as the shooter at trial even though he did not recognize him, did not believe that Fernandez had shot Quintero, and had "[n]ever [seen Fernandez] in [his] life." App'x 2523. When asked why he falsely accused Fernandez, Canela testified that he was scared because it was his first time in court, and he felt pressure from the detectives.

At Fernandez's trial, Canela had testified that he was never shown any photos by the detectives. At the hearing, however, Canela testified that he had been shown a photo array by Officer Melino when he met with him two years after the murder, and though he did not recognize anyone in the pictures, he chose the picture of Fernandez because the detectives "were emphasizing one specific picture, and that picture was shown to [him] over and over and over again." App'x 2522. The detectives told him that they "ha[d] the guy", and it was Fernandez; and they "actually helped [him] believe that [Fernandez] was the guy." App'x 2589. Canela also testified that the detectives told him where Fernandez would be sitting in the courtroom when Canela testified.

27

Canela's wife, Edmonds, testified that Canela told her when they first started dating in the early 2000s that he had falsely identified Fernandez and he had felt coerced into making an ID.

The Government called Detective Tebbens, the officer who worked with Officer Melino recanvassing the neighborhood where the homicide took place before trial. Tebbens testified that, at Canela's first meeting with them, he told them what happened on the day of the murder, and gave a physical description of the shooter. While Canela did not identify the shooter by name, he told the detectives he would "recognize the shooter again if he saw him." App'x 2622. Detective Tebbens and Officer Melino then made arrangements to bring Canela to the District Attorney's Office, where he was interviewed by the Assistant District Attorney. Detective Tebbens testified that he never showed Canela any mugshots or photos at any time during the investigation; and that he never observed Officer Melino showing Canela any mugshots or photos. He further denied that he ever told Canela where Fernandez would be seated at the trial.

Officer Melino did not testify.

**2.**

The state court denied Fernandez's motion, finding that Canela's recantation was not credible and that there was therefore no basis to find that the prosecutor had offered perjured testimony at the trial. Fernandez argues that this credibility determination was an unreasonable determination of the facts in light of the evidence presented at the hearing. See 28 U.S.C. § 2254(d). We agree. A close reading of the state court decision demonstrates that its conclusion is unsupported and unsupportable.

The state court's decision opened with an acknowledgment that "the main issue at the hearing was the credibility of Jesus Canela. Indeed, if his hearing testimony were to be fully credited, then the defendant would be entitled to a new trial." App'x 44. Given the record facing the state court at the time of Fernandez's second motion, this was a sound observation. At that time, Officer Melino had been compromised; two of four witnesses who identified Fernandez at trial had recanted (one by affidavit); and the second victim of the shooting (who had not been located at the time of trial) had come forward to say that Fernandez did not shoot him. In light of this record, the credibility of Canela's testimony took on critical weight.

29

The state court allowed that, "[a]t first blush, Mr. Canela's hearing testimony seemed somewhat plausible. A troubled teenager at the time of the trial, he has become a responsible adult who has lived a stable, normal life for some time." App'x 44. This observation was well-supported by the record. Canela testified at the hearing that he was living with his parents in Harlem, that he had been working as a cook at a restaurant for six years, and that he was a few credits shy of receiving an associate degree from Monroe College in Hospitality and Culinary Arts.

Moreover, the court found that "there [was no] showing at the hearing that he had a motive to lie." App'x 44. Again, this finding was well-supported by the record. There was no credited evidence at the hearing that Canela had been threatened or coerced by Fernandez or any of his family members to come forward with his recantation.

The court then acknowledged that Canela's testimony had a ring of truth in light of the allegations against Melino: "[Canela's] primary assertion at the hearing--that he had been pressured and assisted by corrupt police officers into giving false testimony at trial--could not be rejected summarily, given his youth

30

and lack of sophistication at the time coupled with the fact that one of the officers was terminated for unrelated misconduct." App'x 44.

The state court's first negative observation about Canela's testimony was that his "demeanor at the hearing . . . left much room for doubt," specifically, that Canela "came across as someone who was trying too hard to be convincing." App'x 44. While deference is owed to a judge who observed the witness's demeanor, see In re Payne, 707 F.3d 195, 201 (2d Cir. 2013), this observation is underwhelming. Moreover, that same reason was the only reason given for disbelieving Canela's wife, who testified that Canela had confessed to her--long before--that he lied at Fernandez's trial.

The state court went on to question why Canela "had waited so long to come forward" if he "had felt terrible about the situation for years." App'x 44. But the state court did not consider the compelling explanation that Canela offered: "I did not tell [earlier] about the things I am telling you now, for the simple fact, the reason that I was afraid myself. . . . I did not want to get into any more trouble with the law. So I did not say anything." App'x 2580. Canela's recantation was a confession to a felony (perjury); it was unreasonable for the

31

state court to place great weight on a citizen's prolonged hesitation to voluntarily place himself in peril of imprisonment.

The state court pointed out that, "like anyone who recants, we now know that [Canela] has lied under oath on at least one occasion." App'x 45. True enough as far as it goes, and it is a useful canon about recantation. But this observation says nothing about the one critical inquiry here, which is when he lied, then or now--and whether he lied to his wife in the years intervening. It is not a sufficient basis for discrediting a witness's recantation testimony, because it is true of every witness who recants.

The state court then turned away from Canela's testimony at the hearing, and focused on his testimony at Fernandez's trial:

> Any lingering doubts concerning Mr. Canela's credibility at the hearing were put to rest by his trial testimony which I have read and re-read countless times. As I said, I can accept the possibility that in the heyday of the crack epidemic in the 90's a young person might have been coached and even coerced by overzealous police officers. But I find it very hard to believe that such a compromised witness would be able to withstand the cross-examination of a highly-skilled defense attorney. Even though Mr. Canela was an unsophisticated teenager at the defendant's trial, he not only stuck to his story but he was also able to provide the kind of details on direct and cross that one would expect from a truthteller.

App'x 45. As the court conceded, an 18-year-old witness would be vulnerable to coercion by an overzealous cop. But the state court went on to discredit the

32

recantation because Canela's detailed testimony at trial could be "expect[ed] from a truthteller", App'x 45, and drew the (unaccountable) inference that if he told the truth about facts and circumstances that he did not recant, he likely told the whole truth. This amounts to very little.

As an initial matter, the state court judge did not preside over Fernandez's trial; so his determination that Canela's testimony at that trial was credible is therefore entitled to reduced deference. See In re Payne, 707 F.3d at 201 ("We have given . . . somewhat lesser deference to credibility findings based on an analysis of a witness's testimony."). More important, much of Canela's trial testimony can be reconciled with his recantation. At trial, Canela testified primarily about the circumstances of the murder: what he was doing that day, what the car carrying the gunman looked like, where and how the car parked on the street, what the shooter did when he emerged from the car, who was shot, how the car left the scene, and who he spoke to after the murder. Canela's recantation does not cast doubt on any of these particulars, because, as the state court acknowledged later in the opinion, Canela "has not recanted his testimony regarding the manner in which the shooting carried out, including his description of the car and the gun." App'x 49.

Canela's recantation contradicts only a small part of his trial testimony, regarding a few discrete (albeit critical) issues: who the shooter was, whether Canela was shown mugshots by the detectives at any point, whether Canela was told where the defendant would be sitting in court, and whether anyone took notes during his meetings with the detectives and the Assistant District Attorney. Over the nearly 100 pages of testimony on direct and cross-examination, Canela was asked fewer than 30 questions on these topics, and his answers did not require detail or elaboration; Canela answered the majority of those questions with a simple "no". The credibility of monosyllables is difficult to glean from reading a transcript. It was, therefore, unreasonable for the state court to infer that Canela's recantation was not credible simply because Canela provided credible "details" and withstood "cross-examination of a highly-skilled defense attorney" at Fernandez's trial.

The state court did appropriately consider the portions of Canela's trial testimony that were directly contradicted by his recantation, specifically that he "had not been shown any mug shots by the police, that no one had told him where the defendant would be sitting, and that no one had been taking notes when he was interviewed by the Assistant District Attorney." App'x 46. But

34

Canela explained twice during his testimony that he had lied at trial about these issues because the detectives told him not to testify at trial about their discussions. See App'x 2523 ("[T]hey mentioned that I don't have to say anything that they, you know, they asked me not to say."); App'x 2588 ("I testified untruthfully at trial because, when I met with the detectives, they told me I don't have to say anything that I speak with them, like anything that I talk about with them doesn't have to be said in court."). A teenager's admitted fear of the detectives, and of appearing in court, lends plausibility to testimony that he felt pressure to follow the detectives' instructions regarding how to testify in court (and what to testify about). Having found that Canela was plausible at first blush, with the ring of truth, and no motive to lie, the state court offered no reason to disbelieve this explanation.

The state court also discredited Canela because his testimony "regarding the claimed efforts of police officers to solicit a false identification" was "short on details." App'x 45. The record demonstrates that Canela explained several times how, at some length, and in detail why he felt pressured by the officers to identify Fernandez in the photo array and to accuse him at trial. Canela testified that the officers brought him to an office, they showed him some pictures, and

35

they pressured him into identifying Fernandez by repeatedly emphasizing that one photo:

> Well, they were showing me pictures of the people they were showing me, but they were emphasizing one specific picture, and that picture was shown to me over and over and over again. And I felt, in a sense, I mean, I felt like if there was some sort of pressure being applied towards me, when it came to that same picture, and there came a point where it was asked so many times where I said, you know what, if that's the person, then that's the person. You know. I pretty much gave into saying it's obvious that you want me to point this person out, so I pointed the person out.

App'x 2522. This testimony is a straightforward account that Officer Melino heavy-handedly encouraged Canela to select Fernandez. Canela also testified that the detectives directly told him that they "ha[d] the guy," and it was Fernandez; and they "actually helped [him] believe that [Fernandez] was the guy." App'x 2589. Canela's account is much too specific to support an adverse credibility finding based on vagueness. Certainly, the state court did not mention anything it found missing.

Finally, the state court discredited Canela's testimony that he lied at Fernandez's trial because he was "afraid" and "scared," finding that Canela failed to "describe anything the officers said or did to instill such fear in him." App'x 47. But Canela testified that he was afraid because he had never been a witness in court before: "I was afraid. I didn't know what to do anymore. It was

36

my first time in court. I had never seen anything. I had never been in court before." App'x 2589. The state court offered no a reason to discount this explanation. Canela's statement that he was frightened is corroborated by testimony he gave at Fernandez's trial, in which Canela explained that he only spoke with investigators about the murder "[b]ecause they said that they was [sic] going to protect me. Nothing would happen to me." App'x 507.

The state court's decision contains sound reasons to credit Canela's recantation, and no plausible reason to discredit it. Accordingly, the state court's rejection of Canela's recantation was an "unreasonable determination of the facts in light of the evidence presented," 28 U.S.C. § 2254(d); therefore, the state court unreasonably denied Fernandez's second motion for a new trial.

Based on Canela's testimony at the state court hearing, Fernandez has satisfied the first element of his claim for a new trial based on prosecutorial misconduct: Canela's perjured testimony at the trial. We still must determine whether Fernandez has made out the other elements of his claim, namely that: "(ii) the alleged perjury was material; (iii) the government knew or should have known of the perjury at [the] time of trial; and (iv) the perjured testimony remained undisclosed during trial." Cromitie, 727 F.3d at 221. As the state court

concluded, the other elements are satisfied: "[I]f [Canela's] hearing testimony [is] fully credited, then the defendant would be entitled to a new trial." App'x 44.

The State does not dispute that knowledge of the perjury is imputed from Officer Melino to the prosecution team, or that the perjured testimony remained undisclosed at trial.

As to materiality, Fernandez is entitled to a new trial "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." Cromitie, 727 F.3d at 221-22 (quoting Agurs, 427 U.S. at 103). "Indeed, if it is established that the government knowingly permitted the introduction of false testimony reversal is 'virtually automatic.'" United States v. Wallach, 935 F.2d 445, 456 (2d Cir. 1991) (quoting United States v. Stofsky, 527 F.2d 237, 243 (2d Cir. 1975)).

There was more than a "reasonable likelihood" that Canela's eyewitness testimony influenced the jury. Canela unequivocally identified Fernandez as the shooter at trial, and "eyewitness testimony is among the most influential, even as it is among the least reliable, forms of proof." Kampshoff v. Smith, 698 F.2d 581, 587 (2d Cir. 1983). "Whenever such proof is admitted, there is a genuine likelihood that the jury will base its decision on it." Id.

38

## IV. CONCLUSION

Accordingly, we REVERSE and REMAND to the district court, with instruction to comply with our February 5, 2019 Order, directing the district court to issue a writ of habeas corpus to Fernandez by the sixtieth calendar day after February 5, 2019 unless the state has, by that time, taken concrete and substantial steps to retry Fernandez.